1  ROBERT BAKER
2  2069 N  Beverly Glen Blvd
   Los Angeles, CA  90077
3  310-746-6191
4  310-234-1241(fax)
   In Pro Per
5  robertbaker.executor@gmail.com
6
   
   LODGED
   CLERK, U.S. DISTRICT COURT
7
8  MAY 2 2 2014
9
   CENTRAL DISTRICT OF CALIFORNIA
   BY                          DEPUTY
10            UNITED STATES DISTRICT COURT

11        FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  | ROBERT BAKER,  an individual. | CASE NUMBER: |
    |---|---|
13  |                               | **CV14-03956** |
14  |        Plaintiff,             |              |
    | vs.                           |              |
15  |                               | **COMPLAINT** |
16  | AMERICAN EXPRESS, Inc.;       | 1) Sherman Act (15 USC §§1 and 2) |
17  | AMERICAN EXPRESS FINANCIAL ADVISORS, INC.; AMERIPRISE | 2) Due process right(14th & 5th amendments |
18  | FINANCIAL , INC.; AMERICAN EXPRESS TAX AND BUSINESS | 3) RICO (18 USC §§1961 et seq.) |
19  | INC..; STANLEY R. COHEN; ALAN | 4) Elder Abuse(Calif. W. & I Code§§15600-15675) |
20  | R.. CUTROW, a professional law corporation; MITCHELL, | 5) Obstruction of Due Administration of Justice(18 USC § 1503) |
21  | SILVERBERG & KNUPP, LLP; | |
22  | KARL DE COSTA, a professional law corporation; CLARK R. BYAM, a | 6) Conspiracy to Obstruct Justice(42 USC § 1985) |
23  | professional law corporation; HAHN & HAHN, LLP; | 7) Breach of Fiduciary Duty |
24  | WILLIAM F. DAVIS, a professional law corporation; MATTHEW J. | 8) American with Disabilities Act(42 USC§ 12101 et seq.) |
25  | FAIRSHTER, a professional law corporation;  JOEL BENNETT,  a | 9) Violation of Securities Act 1933-34(15 USC§§ 1 et seq.) |
26  | professional law corporation; | |

27

28

1

BENNETT & FAIRSHTER, LLP; BETTY CHIA, a professional law corporation; DYKEMA GOSSETT, a professional law corporation; POLLET RICHARD & PATEL, a professional law corporation; NIMISH PATEL, a professional law corporation; LUAN PHAN, a professional law corporation; JODY BORRELLI, a professional law corporation, ROBERT LISKEY, a professional law corporation; MICHAEL D. DONAHUE, a professional law corporation; DELORES YARNALL, a professional law corporation; STEVEN C. GLICKMAN, a professional law corporation, GLICKMAN & GLICKMAN, a professional law corporation; ANDREW J. STERN, a professional law corporation; DAVID MARH, a professional law corporation; SIMON LANGER, a professional law corporation; LEWIS STEVEN GOLDBLATT, a professional law corporation, RICHARD ANTHONY MAHAVIER, professional law corporation; SCOTT S. HARRIS; a professional law corporation; PHILIP ADIDIKOFF, a professional law corporation; ALLEN R. BAKER, as an individual; ALLEN R. BAKER, as a trustee; ALLEN R. BAKER, as an executor; FRANK A. BAKER, as an individual; FRANK A. BAKER, as a trustee; FRANK A. BAKER, as an executor.

a. The Investors Advisory Act of 1940(15 USC §§ 78aaa -78111)

a. The Securities Investors Protection Act o f1970(15 USC §§ 78aaa -78111)

10)    False Pretenses/Conversion
11)    Fraud/Deceit
12)    Professional Legal Malpractice Fraud(Business and Professional Code §6068)
13)    Violation of Title 9 Rules on Law Practice , Attorneys, And Judges of the California Rules of Court;
14)    Declaratory Relief.

**DEMAND FOR JURY TRIAL**

NOW COME PLAINTIFF, ROBERT BAKER, an individual, respectfully, alleges as follows:

2
COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT, ELDER ABUSE OBSTRUCTION OF JUSTICE

1.  Nature of the Action

1.  This is an action that is based on two levels. The first level is the wrongful conduct of American Express Financial Advisors, Inc./Ameriprise(AEFA/AMERIPRISE), American Express, Inc.(AMER) American Express Tax and Business Services(AETBS), and  their agents. The second level is the conspiratorial conduct of the elaborate and sophisticated cover up using attorneys,  both AEFA/AMERIPRISE's counsel, Plaintiffs' lawyers from 2001 and the governmental agency official known as the State Bar of California(STATEBAR).

2.  This is to inform the court and the defendants that due to the circumstances of the urgency that this current lawsuit was drafted and filed, an original lawsuit that had been prepared back in July 2012, was updated to reflect significant facts that have taken place since August, 2012.  Plaintiff did not have the time to properly redraft the original lawsuit and merge the updates in a proper way; all of the updates start on page. 60.  Although Plaintiff did ask the 9th Circuit Court of Appeals in case #13-56902 for an extension, plaintiff has not heard from the court as of the filing of this lawsuit.

/////////////////////////////////////
/////////////////////////////////////
/////////////////////////////////////
/////////////////////////////////////
/////////////////////////////////////////

1.   This is an action that is based on two levels. The first level is the wrongful conduct of American Express Financial Advisors, Inc./Ameriprise(AEFA/AMERIPRISE), American Express, Inc.(AMER) American Express Tax and Business Services(AETBS), and  their agents. The second level is the conspiratorial conduct of the elaborate and sophisticated cover up using attorneys,  both AEFA/AMERIPRISE's counsel, Plaintiffs' lawyers from 2001 and the governmental agency official known as the State Bar of California(STATEBAR).

2.   This is to inform the court and the defendants that due to the circumstances of the urgency that this current lawsuit was drafted and filed, an original lawsuit that had been prepared back in July 2012, was updated to reflect significant facts that have taken place since August, 2012.  Plaintiff did not have the time to properly redraft the original lawsuit and merge the updates in a proper way; all of the updates start on page. 60.  Although Plaintiff did ask the 9th Circuit Court of Appeals in case #13-56902 for an extension, plaintiff has not heard from the court as of the filing of this lawsuit.

/////////////////////////////////////
/////////////////////////////////////////
/////////////////////////////////////
///////////////////////////////////////
/////////////////////////////////////////////

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT, ELDER ABUSE OBSTRUCTION OF JUSTICE

## II. Jurisdiction and Venue

2.     The jurisdiction of this court is invoked and this action is instituted under the provisions of §§ 1331, 1332, 1337 and 1367 of Title 28. United States Code ( 28 U.S.C.  §§ 3331, 1332,1337 and 1367) and §§ 4.12 and  16 of the Clayton Act(15 U.S.C. §§ 15, 22, 26) ,  and  American with Disabilities Act   42 USC §§ 12101  based on  federal question , regulation of commerce and supplemental jurisdiction. It is brought to declare the rights of PLAINTIFFS to recover damages sustained by PLAINTIFFS as a result of Defendants unlawful actions and to obtain injunctive and declaratory relief.

3.     28  USC § 1331 which gives districts courts original jurisdiction over civil actions arising under the Constitution , law or treaties of the Untied States

4.     28 USC § 1343 (3) and (4) which gives district courts jurisdiction over actions to secure civil rights extended by the United States government.

5.      28 USC § 1367, which gives the district court supplemental jurisdiction over state law claims.

6.     The matter in controversy exceeds the sum or value of $75,000 exclusive of interests and costs.

7.     Venue is proper in the Central District of California under § 12 of the Clayton Act (15 U.SC. § 22)  and   under 28 USC §1391 because  Defendants AMEX, AEFA, AETBS,  Ameriprise and the State Bar  transact business and are found within this District .

8.     Defendants AEFA has offices in the Central District of California and is qualified to do business in the State of California.  AEFA and Ameriprise have done and do substantial business in the Central District of California.  AEFA and Ameriprise, as hereinafter set forth, intentionally violated Sections 1 and 3 of the Sherman Act and the Racketeer Influenced and Corrupt Organizations Act through acts which, in part occurred in the Central District of California and which have already injured PLAINTIFFS in their trade and business.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

9.     All of the law firms herein named have office in the Central or Southern District of California and are qualified to practice law in the State of California. Defendant State Bar has offices in the Central District of California   and are qualified to do business in the State of California.

## III.   Parties.

### Plaintiffs

10.     Plaintiff Robert Baker ("PLAINTIFF") was and is a resident of the State of California, County of Los Angeles during all times mentioned in this complaint.

11.     Plaintiff Estate of Kate Baker (hereinafter, "ESTATE") was formally created on August 1, 2001 by virtue of the Los Angeles County Probate Court order via the letters of testamentary.

12.     Plaintiff & ESTATE, (hereinafter, "PLAINTIFFS") is a combination of both Plaintiff & ESTATE.

13.     Kate Baker, an individual, was a resident of the State of California, County of Los Angeles at all times during the times mentioned in this complaint.

14.     Plaintiff is also suing as an executor, on behalf of the Estate of Kate Baker.

### Defendants

15.     William F. Davis (hereinafter, "DAVIS"), a professional law corporation.

16.     Matthew J. Fairshter (hereinafter, "FAIRSHTER") is a professional law corporation, and a partner in Dykema, Gossett and Bennett & Fairshter.

17.     Joel R. Bennett ((hereinafter, "BENNETT"') is a professional law corporation, and a partner in Dykema, Gossett and Bennett & Fairshter.

18.     Betty Chia, (hereinafter, "CHIA"), was an associate at Bennett & Fairshter and Dykema, Gossett during the time they represented Plaintiff.  CHIA

worked on all aspects of Plaintiff's legal situation; including: Probate case, NASD, Superior Court filings.

19.   Bennett & Fairshter, LLP, (hereinafter, "B&F") is a professional law corporation.

20.   Dykema, Gossett, LLP, (hereinafter, "DYKEMA") is a professional law partnership including professional law corporations.

21.   Michael O Donahue, LLP (hereinafter, "DONAHUE") is a professional law corporation.  DONAHUE was and is a partner in the law firm of Pollet, Richardson & Patel.

22.   Pollet Richardson & Patel, LLP (hereinafter, "RP") is a professional law partnership including professional law corporations.

23.   Luan Phan, (hereinafter, "PHAN") is a professional law corporation. PHAN was the managing partner at the time of RP representation of Plaintiff and ESTATE.

24.   Steven C. Glickman, (hereinafter, "GLICKMAN")  is a professional law corporation. LLP.

25.   Glickman & Glickman, LLP (hereinafter, "GLICKMAN & GLICKMAN") is a professional law partnership including corporations.

26.   Andrew J. Stern, (hereinafter, "STERN") is a professional law corporation.

27.   Simon Langer, (hereinafter, "LANGER) is a professional law corporation.

28.   Richard Anthony Mahavier, (hereinafter, "MAHAVIER") is a professional law corporation.

29.   American Express, Inc.  (hereinafter, "AMEX") is a Delaware corporation.

30.   American Express Financial Advisors, Inc. (hereinafter, "AEFA") is a Delaware corporation.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

31.     Ameriprise Financial, Inc. (hereinafter, "AMERIPRISE") is a Delaware corporation.

32.     "AEFA/Ameriprise" refers hereafter collectively to the parties named in paragraphs 30 & 31.

33.     American Express Tax and Business Services, Inc. (hereinafter, "AETBS") is a Delaware corporation..

34.     State Bar of California, (hereinafter, "STATEBAR") is a governmental body, an administrative arm of the California Supreme Court.

35.     Stanley R. Cohen, (hereinafter, "COHEN") is an agent of AEFA/Ameriprise and as a financial and investment advisor.

## IV.   Common Allegations

36.     Plaintiff who was named an executor in the will of Kate Baker was adjudicated via the letters of testamentary.(Exhibit 1)

37.     Plaintiff suffered from a developmental disorder which caused him serious learning disabilities since childhood.  Plaintiff went through a psychoanalysis for treatment for 10 years and has ,made substantial gains.(Exhibit 2)

### AEFA, Cohen's Involvement

38.     Plaintiff received a phone call from Cohen in early 1996 and was told that Kate Baker had moved her monies to AEFA and Plaintiff should to. Plaintiff was convinced to transfer his monies from and effectuated a transfer in the early part of 1996 from Bears Stearns to AEFA..  Plaintiff told Cohen what he wanted to invest in and Cohen stated he would.

39.     Plaintiff will give summary of the actions of AEFA from 1996 to Kate Baker's death on January 28, 2000 in the form of a summary that was given to Mahavier which he gave to Philip Aidikoff, a securities arbitration specialist who was becoming the expert on Plaintiff legal team under Mahavier and Harris.(Exhibit 3)

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

40.     Kate Baker died on January 28, 2010, Plaintiff obtained the legal counsel of Maurice Katz and I Richard Ruman.. After having paid KATZ approximately $40,000 and RUMAN approximately $32,000, for advise and service   Plaintiff knew he had to seek an expert in the field of probate and estate law.

**Clark Byam, Hahn & Hahn, Mitchell Silberberg & Knupp Involvement**

41.     Plaintiff contacted Clark R. Byam of Hahn & Hahn . Plaintiff asked Byam if he knew Allan Cutrow ("Cutrow") who was a partner at Mitchell, Silverberg and Knupp ("MSK"), and he stated he did.  Plaintiff made an appointment to meet with Byam.  Prior to the meeting, Plaintiff sent all of the legal documents he had obtained to Byam for review.

42.     At the first meeting, Byam suggested that after his review of the documents Plaintiff had sent him he would render his advice.  His advise was: first, he would get the documents necessary to see if Plaintiff had a case against AEFA and, second, he wanted to set up a meeting with Cutrow and my brothers Allen and Frank Baker.  A meeting was arranged.  After many months went by, Byam stated to Plaintiff that he had received the documents.  By the time Byam informed Plaintiff that he had received documents, Plaintiff had already decided to have DAVIS represent Plaintiff in any lawsuits against AEFA and Stanley Cohen and not Hahn & Hahn.

43.     During the summer of 2001, William C. Garr of Hahn & Hahn called Plaintiff to suggest a meeting to discuss their representation of Plaintiffs against AEFA. He told Plaintiff that he, Byam, and their expert had reviewed the documents and believed Plaintiffs had a strong case against AEFA. He explained on the telephone that they had never done a securities arbitration case but that he could keep it in the United States District Court.  Garr did say he would send Plaintiff some promotional material.  Plaintiff received the promotional material within a few days.  He also stated to Plaintiff that he would send Plaintiff a few

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

names of securities arbitration specialists since Plaintiff was hesitant about Hahn representing him in a securities case in arbitration.

44.   By this time in late 2001,  Plaintiff had meet with DAVIS and after DAVIS had reviewed all documents and had Katie Bake(not related to the decedent Kate Baker) also to review documents wanted to represent Plaintiff in bringing lawsuit against AEFA for recovery on Plaintiff's personal account and the  Estate monies; the Baker Family Trust  & Baker Family Partnership. .

45.   In December, 2001  Byam suggested that there be two depositions, one of Plaintiff and one of Allen Baker.. Plaintiff suggested a deposition of COHEN but Byam instead  stated that could occur if a settlement could not be reached at the mediation  By this time, Plaintiff had chosen to have DAVIS represent Plaintiff on behalf as an individual and as an  executor..  The depositions would be confined to the Plaintiff's personal account at AEFA and then there would be mediation for a possible global settlement. At the mediation Byam strongly suggested that Plaintiff settle with Allen and Frank and enter into a  Settlement Agreement., The settlement was an agreement between Allen, Frank, and Robert Baker as partners, executors and trustee of the various family entities. After the settlement then Plaintiff was to bring an action for claims against  AEFA and COHEN.  The settlement agreement of 2002, specifically excluded from release AEFA and COHEN.  At the May 30, 2012 Superior Court hearing in Case #BC394851,  the court strongly implied that  Hahn & Hahn may have received and reviewed  documents pertaining to the BFT and BFP  without disclosing or advising Plaintiff of such.   Part of the Settlement agreement was to create a Robert Trust  and to have CNB be the trustee, this  fact becomes relevant, in that in 2007, Plaintiff sought to terminate the Robert Trust at City National Bank(CNB) and would eventually lead to legal malpractice  lawsuit and discovery of Byam's perjury. It also leads to a report that Plaintiff filed against CNB for their unethical conduct and elder abuse while trustee.  The report was filed with

the federal regulators who regulate national banks: Office of the Controller of the Currency. . As far as Plaintiff knows it is ongoing.

46.     Plaintiff did receive a few name from William Garr of Hahn & Hahn of securities arbitration specialists in a few days along with the promotional material. Plaintiff decided to call and interview AIDKOFF, one of the names of an expert in securities arbitration.

47.     Plaintiff made an appointment and at the meeting gave Aidikoff a history of the case which up to that point in 2001 was basically some information about AEFA management of the money and a detailed family history. Aidikoff recommended that his office requests documents from AEFA on the Plaintiff personal account account.  Having been in the legal system for some 12 years now and having an understanding of another law firm feeding or referring a case to another specialist and the referring law firm getting a referral percentage, Plaintiff can cow appreciate that Aidikoff may have already had some documents from either Hahn & Hahn and/or MSK that they received from AEFA counsel as stated in the Ameriprise Subpoena Objection stated below.. Aidikoff stated he knew Cutrow from being involved with the Jewish Federation of Los Angeles.. The documents for the Plaintiff's personal account came within a few months; more importantly, Aidikoff and his associates could see that Plaintiff had some communication problems and learning disabilities  Aidikoff declined representation owing to the fact that Plaintiff would not be dependable witness in an NASD arbitration. In September, 2011, MAHAVIER did contact and discuss the legal situation again and agreed to be an expert Jane Baker's prepared a detailed summary with 2 CD's composed of hundred of AEFA's documents which was sent to Aidikoff. ( Exhibit 3)

48.     At the same time that Plaintiff was meeting with Aidikoff,. a family friend who was also a CPA and a stock broker, Robert Fenton, referred Plaintiff to the woman who had been his instructor to help him pass the stockbrokers tests,

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

Kate Baker . Plaintiff spoke to Katie Baker would refer Plaintiff to DAVIS in due course.

### Davis Involvement

49.    When Aidikoff declined representation of Plaintiff, he called DAVIS and set up a meeting.  DAVIS gave all of the documents to KB who was a specialist in securities.  After a detailed review of all documents which include Baker Family Trusts, Baker Partnership, DAVIS advised plaintiff he would file a lawsuit against AEFA and Stanley R. Cohen

50.    DAVIS filed the initial Superior Court lawsuit case # LC060762 in 2002. The AEFA and COHEN moved to compel to arbitration . In the initial lawsuit, DAVIS sued for only the RBT account informing Plaintiff that he would later add the ESTATE when he would file in the NASD. The court compelled the case to arbitration DAVIS specifically asked the court to stay the case until after the NASD ruling specifically to give DAVIS discovery since the NASD lacked discovery power which he knew was not true.   DAVIS filed the initial complaint in the NASD but did not name the ESTATE as a party.   In the amended complaint in the NASD, DAVIS did add Plaintiff as a beneficiary saying that was sufficient to collect damages for the Estate..  DAVIS voluntarily dismissed the superior court case in January, 2003 without informing Plaintiff. By late 2003, DAVIS advised Plaintiff he needed to get out because he was ill. The agreement with Davis was for 20% on contigency and a $10,000.00 non-refundable fee.

### Bennett & Fairshter, Dykema & Richardson & Patel Involvement

51.    Plaintiff was recommended to B&F by William Comanor. .  Comanor was a long time good friend of BENNETT of  B&F. Comanor was also a very long time good friend of Donahue a partner at R&P... Comanor had learned a great deal about the case from his then wife, Joan Miller. Plaintiff meet Joan Miller as a colleague at a mental health clinic where both were dong internships. . In late 2008,  Plaintiff would learn by way of the State Bar  website that at the

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

time of the Comanor referral in 2004, B&F had embezzled millions of dollars
from their clients through forgeries and creating conflicts of interests in at least
two other cases that B&F were handling for other clients.. Had the Plaintiff
known that  or  the  STATEBAR were required that each lawyer inform their
existing clients and/or future clients that an ongoing investigation(s) was in
progress on the individuals Calbar site page, Plaintiff would never have retained
them

52.    In September 2004 Plaintiff meet with B&F for their initial meeting,
B&F took a complete legal and securities history. .  In September, 2004, Jane
Baker reviewed the original Superior Court file (LC060762)and discovered the
voluntary dismissal by Davis, When BENNETT discovered the dismissal,  he
would say, "that's malpractice"  a legal malpractice lawsuit against DAVIS  was
never filed.. After reviewing the NASD file ,B&F started filing discovery
motions to get documents on the Estate.. On May 30, 2012  in the Superior court
case #BC 394851 the court would inform Plaintiff that since the NASD lawsuit
was only about Plaintiff's personal account, Plaintiff  was not entitled to any
documents that concerned the Baker Family Trust(BFT) or Baker Family
Partnership(BFP).  Plaintiff was charged approximately $150,000.00 by B&F.   .
During the summer of 2005, B&F substituted in from Hahn & Hahn upon behalf
of Plaintiff as an executor in the Probate for the Estate.

53.    Plaintiff's wife Jane prepared a very detailed summary of the acts of
B&F, DYKEMA, and R&P for the Renewal of the Motion for Reconsideration
heard on May 30, 2012. (Exhibit 4)

54.    Also during this time, Plaintiff retained the services of forensic
accountant Jim Gill on the advice of B&F and was charged approximately
$150,000.00.  Approximately 85% of the fees charged by Gill were the result of
forensic accounting services pertaining to the 1999 Will, Baker Family Trust

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

accounts and Baker Family Partnership accounts, which were not part of the NASD arbitration.

### Glickman Involvement

55.     On or about August 2006 Plaintiff was recommended  Glickman as a possible legal malpractice attorney  .Glickman was very well known in the legal community as a former president of the Consumer Attorneys Association of Southern California as his father before him.  Plaintiff set up an appointment to meet with him.  At the meeting Plaintiff explained to him that he needed both a legal malpractice attorney and also an appellate lawyer.  Glickman referred Plaintiff to appellate attorney Delores Yarnall. GLICKMAN in late 2006 advised and compelled Plaintiff to go In Pro Se in the Probate Case as it was no longer necessary  to have an attorney representing on behalf of the Estate for two reasons. First, the legal malpractice lawsuit, if  it became necessary, would be on behalf of the Estate and second, if we needed to get documents, the legal malpractice  lawsuit would be the appropriate vehicle.  It was on May 30, 2012 the superior court  in Case #BC394851  Judge Susan Bryant-Deason informed Plaintiff  that the legal malpractice action was solely about the personal account of Plaintiff at AEFA and therefore, all documents pertaining to the BFT and BFP were irrelevant, and third only members of the bar could bring lawsuits on behalf of the Estate. Plaintiff had been advised by letter and email from B&F and Dykema counsel in February 2012, that only members of the bar could represent Estates.  All three facts, first, that the legal malpractice lawsuit was solely about Plaintiff's personal account at AEFA, the issue of obtaining documents  from AEFA/Ameriprise  through the legal malpractice  lawsuit , and third,,  Plaintiff could recover damages of behalf of the estate were inconsistent to what GLICKMAN had advised Plaintiff on when Plaintiff was compelled to go In Pro Se in 2006.

56.     Plaintiff, on information and belief, alleges that Glickman entered into an  agreement with Phan and R&P to deceive Plaintiff into believing that Glickman would be the legal malpractice attorney if the Appeal was lost, knowing all along the legal significance of the NASD ruling that he learned from Evans in September, 2006.

57.     In August, 2006, Yarnall called Plaintiff up to inform Plaintiff  that she had received a bizarre phone call from Ameriprise counsel Lowery insinuating that Plaintiff had no case, that Plaintiff was crazy and  Yarnall would be sued for filing a frivolous appeal.  Lowery was trying to take advantage of the fact that Plaintiff had a developmental disorder with learning disabilities.   Glickman stated he would contact attorney Phan of R&P. Glickman would receive a binder of some materials from R&P and stated to Plaintiff that Glickman contacted a securities arbitration expert Jonathan Evans  With the information that Plaintiff was informed by the honorable Susan  Bryant-Deason,  Plaintiff now alleges, on information and belief, that an agreement was made between Glickman and Phan in that Glickman would not sue R&P or the individual attorneys at the firm, keep quiet abut the tolling of the Statute of Limitations of the NASD ruling. . Evans wanted $5000.00 to draft an opinion letter concerning a possible legal malpractice case.  When the remittitteur from the Court of Appeals came down in February, 2008,  GLICKMAN demanded from Plaintiff $5000.00 for the expert, otherwise GLICKMAN would not file the legal malpractice lawsuit.

## Federal Bureau of Investigation Involvement

58.     In September 2007, Plaintiff had a discussion with Riverside Lead Elder Abuse  District Attorney  Tristan Sware  regarding some legal documents that Plaintiff had showed him..  Sware responded saying that because of the national nature of the documents,  Plaintiff should take this to the United States Attorneys Office..  Plaintiff asked for a name at the US Attorneys office and received a name.  Plaintiff located the person in Washington DC as part of

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

Congress.  After a few emails, the US attorney recommended  Plaintiff to take the documents to the FBI because they are the investigative agency who does the investigation  for the US. Attorneys office.. Plaintiff was advised that the FBI only takes an interest in a very small percentage of cases.. Plaintiff did take the documents to the West Los Angeles office of the FBI.  Plaintiff dropped the documents off and discussed it with the FBI agent on duty.  A few days went by and Plaintiff received a phone from special agent Steven Goldman.  After a discussion on the phone,   Special agent asked my wife and Plaintiff  for a meeting.  At the meeting which lasted almost two hours.  Goldman became very interested in Plaintiff's  legal situation.  He stated that he would find out were the attorney complaint that Plaintiff had filed against Bennett & Fairshter was in process.  He also requested that Plaintiff send all old and new attorney complaints and  any and all documents pertaining to Plaintiff's legal situation to him.  He gave Plaintiff his FBI card with the fax number written in.   A few days later Plaintiff received a letter from the State Bar requesting that they wanted Plaintiff to come in for an interview to discuss the complaint Plaintiff had filed against attorneys B&F law firm.   Plaintiff made the appointment to see investigator Michael O. Chavez..  When Plaintiff entered the little interview room, Chavez informed Plaintiff  that he had just talked to BENNETT who had told  Chavez that BENNETT had represented Plaintiff for only a few months.  Plaintiff informed Chavez that was not the case. We discussed the case for over a period of two days and almost 4 hours.   At the end of the entire interview, Chavez informed Plaintiff that if they found that any attorneys committed criminal activities it would then be referred to the District Attorneys office.  Exactly one year to the day of filing the original complaint Plaintiff received the letter saying that Chavez had found no problem with B&F actions.  As requested by Special Agent Goldman,  Plaintiff forwarded the  letter to the FBI.. Plaintiff has continued honoring the request to the present day and has forwarded all documents.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

59.    Plaintiff, on information and belief, alleges that the STATE BAR of California entered into an agreement with DYKEMA, who represented American Express to look the other way and find FAIRSHTER not guilty of criminal activity which was directly opposite the findings in a Federal court Sanction Order against FAIRSHTER.(Exhibit 4)

## Ameriprise contact with Plaintiff in 2008

60.    After the legal malpractice case against B&F and Dykema Gossett had been filed in   Superior Court on July 28, 2008, on August 18, 2007, Plaintiff received a phone call from AEFA/Ameriprise agent Timothy Swanson ("SWANSON") who stated that, "as a trustee", Plaintiff would want to know about their findings.  A letter followed a few days later, stating that in 2007, AEFA/Ameriprise had performed an in house accounting for the taxable year of 2000, which showed that AEFA had overstated income to the IRS and the State of California, and that Plaintiff was entitled to a payment from Ameriprise to compensate for the personal income tax Plaintiff would have overpaid.  The letter also stated that a check was enclosed, but there was no check inside.  Plaintiff met with Jim Gill, who advised Plaintiff to advise GLICKMAN to send out a subpoena for the accounting.  GLICKMAN stated to Plaintiff that in time he would.   GLICKMAN did not send a subpoena.  GLICKMAN had also advised Plaintiff as did all subsequent attorneys Stern, Langer and Mahavier that in legal malpractice cases there is no recovery for punitive damages in the underlying case.

61.    Plaintiff sent a letter to SWANSON asking for documentation for the in house accounting and telling SWANSON that there was no check enclosed in SWASON's letter.  SWANSON wrote back refusing to provide any documentation, and gave Plaintiff instructions on how to obtain money due Plantiff.  There was no deadline set by Ameriprise for Plaintiff to claim his money.  Plaintiff followed SWANSON's instructions to obtain Plaintiff's money,

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

but received no response.  Plaintiff left a voice message for SWANSON, but he did not respond.  Plaintiff then called the phone number for service that SWANSON had included in the instructions.  Plaintiff's call was directed to an agent who told Plaintiff he was an associate of SWANSON's.  This agent could not find any reason for delay and instructed Plaintiff to fax the request again to SWANSON, to be sure it had been received.  Several days later, Plaintiff received a letter from Ameriprise counsel demanding that he "cease and desist" any contact with Ameriprise, and telling Plaintiff that they had no information for him.  Plaintiff has never received the money Ameriprise stated that they owed him.

62.     In August of 2008, Plaintiff advised GLICKMAN that the FBI had taken an interest in the legal situation.

### Stern's Involvement

63.     Plaintiff was referred to attorney Stern to handle another legal malpractice lawsuit against Hahn  & Hahn(BC408161). The deposition of Byam proved fruitful.  In material areas Byam made false statements concerning material issues. First,  Byam stated that his partner at Hahn, William Garr, after a review of the documents did not want to represent Plaintiff in a lawsuit against AEFA.  In fact Plaintiff has documents from Garr from 2001 which states that indeed, Hahn  & Hahn did want to represent Plaintiff.(Exhibit 5)  Plaintiff learned on May 30, 2012, that Hahn & Hahn  might have received documents from Ameriprise pertaining to the BFT, BFP which Byam neither disclosed and/or gave copies to Plaintiff during 2001-2004. .  Due to STERN's making false statements to the court in his Motion to Withdraw as Plaintiff counsel a mere three weeks prior co trial and that the court stated to Plaintiff that "you have to pay your lawyer" was the reason she allowed him to withdraw. Plaintiff, after the false statements were made by Byam, sought to get more documents which were never produced.   In the original consultation and a few subsequent meetings, Plaintiff gave Stern a very detailed history of the entire legal situation.  Within days,

STERN advised Plaintiff that he thought there were at least two very solid lawsuits.

64.    Plaintiff , on information and belief, alleges that Stern entered into agreement with Glickman to deceive Plaintiff into thinking that Stern was interested to combine the then non-existing Ameriprise State Case with the legal malpractice case on appeal(BC394851) and then claim for financial reasons he had to get out.

65.    In  2009 Stern filed a RICO  Federal Lawsuit (CV09-3179(GHK(FMOx) on behalf of Plaintiff.  Initially when Plaintiff consulted with STERN  Plaintiff informed. that Plaintiff had received the letter from AEFA/AMERIPRISE concerning the check for the refund from AMERIPRISE as a result of the tax audit in December 2007 for the year of 2000. This fact was prominent in the filing of the federal lawsuit.  The  parties knew that Plaintiff was dependent upon the monies he got from his mother and from the 2002 Settlement Agreement and all of the trickle down monies he got along the way.  The plan was to suck every penny out of Plaintiff's pocket so Plaintiff would stop pursuing legitimate claims.

66.    GLCKMAN needed the $5000 by July 31, otherwise the tolling agreement that the defendants, DYKEMA and B&F had signed would end. Plaintiff was forced to settle with Allen and Frank regarding the Robert Trust that had been set up at CNB and give them a huge percentage that they would not entitled to. .

### Ameriprise counsel threatening forensic accountant Jim Sill

67.    During October, 2010,  Defendant AEFA/Ameriprise Counsel Lowery when AEFA/MERIPRISE was a defendant in the Amerprise State Case made a threatening phone call  to the forensic Accountant Jim Gill.(Exhibit 6)

### Stern's Involvement continues

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

17

68.     During STERN's representation of Plaintiff's lawsuits, we often would discuss the legal malpractice Bennett Case that was on Appeal.  Although it was GLICKMANS Case and would be GLICKMAN Case if Plaintiff won the Appeal, STERN made statements that he would like to combine the Ameriprise State Case with the Appeal case.  STERN had the Ameriprise c State case on a 20% contingency except for the non-refundable $5000.00.  After the filing of the Ameriprise State Case, Plaintiff paid STERN monies to effect proper service on the various parties for depositors.  The service was for a deposition to take place for Cohen which never happened prior to the demurring out of the Ameriprise Case.  This same happened in the Bennett legal malpractice case with regard to Cohen again in December, 2011 when Mahavier attempted service of process for a Cohen deposition. In August, 2005, the NASD ordered an immediate deposition of Cohen, it never took place.

69.     In late  2010 Plaintiff would contact Evans for the opinion letter and Evans would inform Plaintiff that Glickman sent him a fax in September 2006 with a copy of the NASD ruling and the fax stated to:  Review and call him. Plaintiff learned from EVANS in 2010 that EVANS did not draft an opinion letter and never received the $5000.00 from Glickman.  Within days of Plaintiff learning this fact, Plaintiff received a check for $5000 from Glickman.  The NASD ruling was based on Code Section 10305, which had two parts: 1)  The lawsuit had to be refiled in superior or federal court 2) The statute of limitations was tolled since the NASD complaint was filed.  Plaintiff's NASD complaint was filed in 2002.  This new information would have significant impact of the issue of Statute of Limitations.

70.     During the later part of 2010, STERN stated for financial reasons he needed to get out of all cases.  Plaintiff learned recently that attorneys(who are officers of the court)  need to get permission from the court to withdraw from a case... At first he stated he needed to get out; then he demanded to get out and

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

eventually threatened Plaintiff and attempted to extort monies from Plaintiff.
Because of the treats, Plaintiff was forced to go In Pro Se on the Ameriprise State
Case(  During the last months of 2010 Plaintiff started to look around for other
lawyers to take over the cases because GLICKMAN had been the original
attorney.

### Marh and Langer's Involvement

71.    Plaintiff had been referred to attorney MARH.   After a couple of
meetings Plaintiff signed the retainer agreement which provided for a non-
refundable $3500.00 and 20%-34% of any settlement or judgment amount. The
agreement included two cases: Case #BC394851 and Case #BC435030.  MARH
then advised Plaintiff that attorney LANGER would be the person doing the
discovery work.  LANGER had been the attorney who had referred Plaintiff to
MARH.  Plaintiff meet with LANGER and advised Plaintiff that he would
immediately respond to the opposition discovery and then at the same time would
begin serving discovery items on the opposition and AEFA/Ameriprise.  First
order of business was  to draft the 4th amended complaint. While LANGER was
preparing the 4th amended complaint, Plaintiff received an email, detailing the fact
that LANGER could not understand why attorney FAIRSHTER had not be named
as a defendant originally by GLICKMAN and why the ESTATE had not be
named as a PLAINITFF also by GLICKMAN.   LANGER added both to the 4th
amended complaint.   Also, LANGER removed the Elder abuse damage provision
saying it didn't have to be in the complaint since the elder abuse was against the
underlying case of AEFA/Ameriprise. This substantially affected the demand for
damages that MAHAVIER  (Exhibit 7)

72.    Soon thereafter, LANGER informed Plaintiff by email that defendants
were moving to strike FAIRSHTER as a named defendant. On May 30, 2012,
Plaintiff would learn that defendants had actually moved to strike out not only
FAIRSHTER but also  the ESTATE from the complaint and were successful

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

MARH knew that Plaintiff was frightened to go In Pro Se since Plaintiff was not a member of the bar and was unble to do competent discovery.  Soon after LANGER had produced the documents which were the result of Jane Baker's efforts , MARH started to attempt to extort monies from Plaintiff.  MARH attempted extortion would scare Plaintiff to find another lawyer which would be extremely difficult because of the deception by various parties.

73.    At the time of the attempted extortion Plaintiff started to interview attorneys to take over the case.  By this time, the Ameriprise State Case(BC 435030) had been demurred out, as the result of  actions of STERN, MARH, LANGER,   and  AEFA/.Ameriprise.

### Steven Lewis Goldblatt's involvement

74.    In late May, 2011 in the process of interviewing attorneys, Plaintiff discussed the case with securities arbitration/legal malpractice expert Steven Lewis Goldblatt from St. Louis, Mo.   Goldblatt informed Plaintiff  of the significance of the NASD ruling code § 10305. Goldblatt explained the § 10305 has two parts:  1) counsel must re-file in Superior Court or Federal Court, 2) The Statute of Limitations is tolled as of when the case was first filed in the NASD, in Plaintiffs case since 2002.   Goldblatt at that the time wanted to be retained either as counsel or as an expert.

### Superior Court Judge Orders Mediation in 2011

75.    The honorable Superior Court Judge Susan Bryant-Deason ordered mediation in early 2011 to occur prior to a hearing in June, 2011.   As of the May 30, 2012 hearing when Plaintiff learned that the legal malpractice lawsuit was solely about the Plaintiff Trust account. it was abundantly clear how contrived , deceitful,  and abusive  the mediation was.. It reminded Plaintiff of his first mediation back in 2001 which was also based in fraud now that Plaintiff knows that his own counsel Byam had deceived Plaintiff in material ways in order to

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

obtain the 2002 Settlement Agreement since Plaintiff had chosen DAVIS to represent Plaintiff in any further action against AEFA/Ameriprise. . In the deposition Plaintiff took back in 2001 which was an abusiveness deposition and should not have taken place had Byam not deceived Plaintiff and allowed Karl de Costa (MSK)who deposed Plaintiff to go into the personal history of Plaintiff which was irrelevant but only allowed to try to have Plaintiff collapse and give up, which at the mediation Plaintiff did collapse and give up.. .

76.     Retired Judge Robert Altman was the mediator in 2011.  Instead of being about the facts of both tiers of the case, it was about the personal history of Plaintiff and why the FBI took an interest in the legal situation.  Plaintiff did not collapse like Plaintiff did in 2001 and accept the $80,000 Plaintiff which was being discussed as an offer.  The mediation lasted a very short time, and the mediator was embarrassed to have been called when parties were not ready to settle, and he left in such a hurry that he had to return for his coat.

77.     Plaintiff was under extreme pressure to find a new law firm to substitute in by the hearing set for late June, 2011 where MARH would withdraw. Plaintiff's  lawyers, MARH and LANGER, as well as all previous attorneys including all defense counsel were aware that Plaintiff was frightened to go In Pro Se.

78.     Plaintiff, on information and belief, alleges that Langer and Marh entered  into an agreement with Glickman,  Dykema and B&F counsel to deceive Plaintiff into thinking that the Estate was part of the legal malpractice lawsuit, and that the Dykema and B&F were entitled to document production concerning the Baker Family accounts, that the legal malpractice case was for damages  of both the personal account of Plaintiff and the family accounts.

### Mahavier and Harris involvement

79.     Plaintiff starting interviewing counsel any where in California. .. Second,  Plaintiff needed to find local counsel if Goldblatt was coming in on the

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

case.  Plaintiff found attorney Harris located in San Diego, CA.  After a few emails where Plaintiff produced all the documents requested by Harris, Plaintiff drove down and meet with Harris.   At the meeting Harris informed Plaintiff that because of the size of the case, he needed co-counsel and recommended MAHAVIER.

80.     Plaintiff thereafter went to San Diego again and met with MAHAVIER and Harris.  Plaintiff made it very clear that what Plaintiff needed was discovery to be done.  MAHAVIER could not understand why discovery had not been done. The condition that they made on the case was that they needed a continuance of the trial in order to do discovery until a few months into 2012.  By June 22, 2011 Plaintiff and MAHAVIER and Harris had entered into two separate retainer agreements with the condition of a continuance of the trial.  When the continuance was granted, the retainer agreement became active which called for each MAHAVIER and Harris to receive non-refundable check for $7500  each and 10% each for any  recovery via a settlement or judgment.  Plaintiff sent one check for $7500 to MAHAVIER and one check for $7,500 to Harris in the US mail.

81.     At the withdrawal hearing, both LANGER and MARH were granted their withdrawals and the court graciously granted Plaintiff a continuance.  Then in October 2011, at the Motion for Sanctions hearing where MAHAVIER drove up to Los Angeles to be present, the opposition were granted sanctions against Plaintiff personally for $3500 and the court sated on record that the verification form of Plaintiff's signature had not been filed along with the summary of accounts, without which the over 160 pages of accounting detail made little sense. This accounting, which MAHAVIER knew was being done by Jane Baker, under the supervision of Jim Gill who was on vacation or on other pressing engagements. Jane Baker  worked around the clock for 2 months to draft and finalize the accounting.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

82.     In October, 2011 MAHAVIER wanted a securities arbitration specialist to consult with.  He mentioned in an email about the Midwest guy so Plaintiff emailed to see if GOLDBLATT was still available and received an email back(Exhibit 8) Plaintiff thereupon emailed Aidikoff as a perspective expert. Soon thereafter MAHAVIER and  Harris  consulted Aidikoff who requested ASAP a decaled summary with documents.  Both of these lawyers are experts in their respective fields.  Also, MAHAVIER deceived Plaintiff into thinking that the ESTATE was still part of the lawsuit and therefore a significant part of the summary that Aidikoff received was irrelevant. . (Exhibit  3) . Jane Baker would have had only to work on the summary of the Plaintiff's  account for two days instead of 2 weeks

83.     Plaintiff, on information and belief, alleges that Mahavier and Harris entered into agreement with Ameriprise to deceive Plaintiff into believing that their was going to be a deposition of Stanley Cohen and second, that Plaintiff, in the legal malpractice case(BC394851) was entitled to documents pertaining to the Baker Family Accounts.

84.     On December 23, 2011 Plaintiff meet with MAHAVIER and Harris in MAHAVIER's office in San Diego for a status conference. MAHAVIER informed Plaintiff that he would file an objection to the Motion for Judgment on the Pleadings.  We spent 3 hours discussing some possible new parties and new causes of action for an 5th amended complaint he would file attached to the Objection to Motion for Judgment on the Pleadings.  MAHAVIER asked  Jane and Plaintiff to think about it and send us certain documents that we discussed in the 3 hour meeting..  At the meeting, MAHAVIER and Harris promised to serve Stanley R. Cohen, stockbroker a subpoena for a deposition.   The subpoena for deposition went out December 27, 2011. Another promise was to serve a subpoena for the production of documents on Ameriprise.  Harris did serve the Subpoena on Ameriprise.  Over the weekend, we worked around the clock to

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

send MAHAVIER and Harris documents and summaries on Monday December 26, 2011.

85.     On January 12, 2012, Plaintiff attended the Judgment on the Pleadings hearing.  Plaintiff would learn during the hearing that not only did MAHAVIER never file an Objection as promised, and an amended complaint, he did not show up either by phone or in person.  Plaintiff immediately, sent an email asking what happened.  Mahavier never replied.

### Plaintiff is forced to go In Pro Se

86.     On January 17, 2012, Harris sent Plaintiff by email a copy of Ameriprise Subpoena Objection which was dated one day after the January 12, 2012  hearing for the Judgment on the Pleadings which had been granted.(Exhibit 9)  Plaintiff decided to go In Pro Se to file a Motion for Reconsideration which had to be filed by January 30,  2012.  Plaintiff who had never filed a Motion for Reconsideration  along with Jane, worked, again, around the clock to meet the January 30, 2012 deadline.   Plaintiff used this new information, at least Plaintiff thought it was new, as the basis for CCP 1108(a).  It was filed on time.

87.     Thereafter, Plaintiff sought to do discovery in both the legal malpractice case and using the still active probate case. When Plaintiff send out subpoenas on the legal malpractice case, the defendants DYKEMA and B&F counsel  opposed stating in emails and  a letter that the legal malpractice case was technically dismissed and therefore, no discovery was permissible . Since Plaintiff is not a member of the bar and did not know, Jane Baker had to work again to withdraw all subpoenas served.  According to California law only members of the bar can sue on behalf of  an estate which is deemed a separate entity, such as a corporation, partnerships, trusts. .

88.     In March 2012, Plaintiff, acting in his capacity as an executor subpoenaed the Estate file of his late mother from MSK who were the firm the represented the Estate of Kate Baker..  The response was an Objection stating

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

among others objections was that Plaintiff did not have standing.   This was curious to say the least, since the Letters of Testamentary that gave Plaintiff his executorship, was drafted and filed by no other than Cutrow as senior partner at MSK.(Exhibit 10 )

89.     Plaintiff sought to do  further discovery using the letters of testamentary and was able to track down the company who had purchased   American Express Business and Tax Records, Inc.  After many phone calls, Plaintiff located where the records were and sent a request accompanied by a copy of the letters of testamentary..  The company,   McGladrey CPA's produced an entire box of tax returns dating back to 1995-2005 with back up.  During the forensic accounting in 2005 Gill found several unknown withdrawals with only account numbers but no other identifications.  A cursory review established that one of the withdrawals which was accomplished by forgeries had been wired to Allen Baker's Family Trust. (Exhibit  12)

90.     The review of the documents also produced by McGladrey CPA's contained a copy of 2005 tax return which showed that an account from Bear Stearns still existed until 2005.  The fact was that all monies from Bear Stearns were supposed to be transferred from Bears Stearns to AEFA in early 1996, but this suggests that was apparently not the case.  Plaintiff contacted Mark Gordon, a broker for the former Bear Stearns, now part of JP Morgan, Inc., and asked Plaintiff to fax and he would check into it.  The fax was sent in April 2012 and on July 16, 2012 Plaintiff followed up with Mark Gordon to find out he did nothing when he received the fax.  Gordon recently contacted Plaintiff and said he was still doing research. (Exhibit 11)

91.     During March 2012 Plaintiff served several probate subpoenas on various people and entities for production of documents and for depositions. Allen Baker and Frank Baker in their capacities as executors filed various objections

with the court and with the then opposition defendants and  AMERIIPRISE counsel.

92.     At the hearing of March 22, 2012,  the court denied Plaintiff's motion for Reconsideration.  During the short hearing, defendants again claimed that the NASD ruled that Plaintiff had no standing and the court stated it did not want to relitigate the matter.

93.     Hearing the deceitful arguments made  by the defendants' Dykema and B&F, Baker filed a renewal of the motion for Reconsideration as allowed by CCP § 1008(b) in the accordance with the provision.

### New Evidence pertaining to the Baker Family Accounts

94.     With the new evidence pertaining to Allen Baker   acts between approximately 1996 with the assistance of lawyers, AEFA/Ameriprise and COHEN, Plaintiff used the CCP 1008(B) to obtain a reversal of the previous motion  This time, Plaintiff was indeed stunned to find that that LANGER who had added the ESTATE to the 4th amended complaint and informed Plaintiff that only FAIRSHTER had been stricken  but deceiffuly left out that the ESTATE had also been stricken.  Furthermore, when MAHAVIER and Harris sought discovery for documents and deposition concernng the BFT and BFP, is was to deceive {Plaintiff.  Baker also wanted to have the court put back on calendar the Motion to Overrule Objections and Compel the Production of documents that had been filed by Baker.  Baker and Jane Baker worked around the clock to put together the motion after having never done this type of motion before.   According to the Ameriprise subpoena objection they had produced documents to the "plaintiff in a prior probate proceeding". Judge Susan Bryant-Deason strongly implied that it was possible that the documents were produced as far back as 2001.

### In Pro Se Clients are discriminated  against

95.     During March, 2012 Plaintiff learned that .there is a rule in the Business and Professions Code that forbids attorneys, paralegals, disbarred lawyers, and

companies, such as LA Reports who provide services to take depositions, etc, to assist In Pro Se clients.(Exhibit 13) .In all prior motions where Plaintiff was In Pro Se  Baker's wife Jane did  extensive editing of the legal filings because of Baker's developmental disorder and learning disabilities. For this Complaint the Plaintiff is doing the work himself.

## V.   Claims for Relief:

### First Claim for Relief

(Against defendants AEFA, Ameriprise, State Bar of California only)

(Unreasonable Restraint of Trade)

(Sherman Act, 25 US C § 1)

96.    Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as if set forth in full.

97.    AEFA, Amerprise have unreasonably restrained competition by and through the control of their agents to insist that their agents, by the use of incentives and other pressure techniques to sell there in-house products which have consistently underperformed to their clients, the Plaintiffs in the instant case.

98.    The State Bar of California have unreasonably restrained competition by and through the complete control and monopoly of access to the state court systems and  which can be had only through the use of its members.  In addition, only its members have access to private companies which are mandatory to engage in the discovery process.  Also, to engage attorneys for "appearances", the companies that provide such services are limited solely to    members of the bar.

99.    The original purpose of the Bar was to provide for the safety and welfare of its residents of access to the court systems to maintain the dignity  and a certain level of expertise which is necessary to practice law.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

100.   Because of the unreasonable restraint of competition, Plaintiff was forced to spend hundreds of thousands of dollars only to be deceived from each attorney or law firm retained as detailed in the factual allegations.

101.   These actions of Ameriprise, AEFA, and the State Bar of California. Constitute unreasonable restraint of trade and commerce and therefore violate § 1 of the Sherman Antitrust Act. 15 U.S.C.  § 1.)

<u>Second Claim for Relief:</u>

(Against Defendants AEFA, AMERIPRISE,  COHEN)

(The Investment Advisers Act of 1940)

(15 USC §§ 80(b) 1-1 through b-21)

102.   Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as if set forth in full.

103.   Defendants, and each of them,  actions as described in paragraph 97 above,  that were deceptive, manipulative and  misleading with respect to the securities that were sold to Plaintiffs were  in  violations of 15 USC §§ 80b-1 through 6-21.

<u>Third Claim for Relief</u>

(Against Defendants AEFA, AMERIPRISE, COHEN)

((The Securities Investor Protection Act of 1970)

(15 USC §§ 78aaa through 78111))

104.   Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as if set forth in full.

105.   Defendants., and each of them, actions  as described in paragraph 110 above, that were deceptive, manipulative  and misleading with respect to the securities that were sold to Plaintiffs were in violations of 15 USC §§ 78aaa through 78111.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

<u>Fourth Claim for Relief:</u>

(Against all defendants)

R.I.C.O.

((18 U.S.C. § 1961 et seq.)

106.   Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as if set forth in full.

107.   At all material times herein, AEFA, AMEX, and Ameriprise, FAIRSHTER, BENNETT, DONAHUE, CHIA, DYKEMA,  PHAN, GLICKMAN, GLICKMAN & GLICKMAN, R&P,  AETBS,  where associated with enterprises engaged  in activities  which affected interstate commerce. Those enterprises consisted of all defendants.  These enterprises had on going organizations with a framework for making decisions, functioned as continuing units and had ascertainable structures and systems of authority guiding their operations, separate and apart from the pattern of racketeering in which each enterprise  engaged herein outlined.

108.   The Defendants and each of the other aforesaid persons or entities who were part of the aforesaid enterprises conspired to conduct and participate in the conduct of the affairs of the aforesaid enterprises, and they conducted and participated , directly and indirectly in the conduct and affairs of the said enterprises  though a  pattern of  racketeering  activity.

109.   Defendant STATEBAR entered into an agreement with DYKEMA who represented American Express not to investigate FAIRSHTER competently to make sure FAIRSJTER would  be found not guilty of criminal acts that a federal court found FAIRSHTER found him guilty of.

110.   Defendant Glickman entered into an agreement with Phan and R&P who had  previously consulted and advised AEFA, American Express, counsel both

Dykema and Eagerton & Weaver and therefore, was part of the concerted enterprise to cause Plaintiffs serious financial loss.

111.   Defendant Stern entered into agreement with Glickman who previously had entered into agreement with Phan and R&P who had AEFA, American Express, counsel Dykema and Eagerton & Weaver, was part of the concerted enterprise to cause Plaintiffs serious financial loss.

112.   Defendants Marh and Langer entered into agreement with Glickman & Stern who previously had entered into agreement with AEFA, American Express, and their counsel Dykema , Eagerton & Weaver, was part of the concerted enterprise to cause Plaintiffs serious financial loss.

113.   Defendant Mahavier and Harris entered into agreement with Langer and Glickman who had previously had entered into agreement with Phan and R&P who had previously consulted and advised AEFA, American Express, counsel both Dykema and Eagerton & Weaver and therefore, was part of the concerted enterprise to cause Plaintiffs serious financial loss.

114.   The pattern of racketeering activity consisted of repeated acts of mail and wire fraud, threatening of witnesses, which constitute an essential part of or were incidental to an essential element of the aforesaid schemes and artifices to defraud Plaintiffs, for which unlawful acts and conduct of attempted extortion and extortion, payoffs and bribery were directly in the administration and enforcement of the racketeering activity and predicate acts in furtherance of the aforesaid enterprise, in which all of the Defendants participated.

115.   All Defendants law firms violated the BADACPA by taking monies from Plaintiffs in the form of legal fees and by failing to clearly disclose the inter-relationships between said law firms(i.e. that Comanor, who recommended Bennett to Plaintiff as a lawyer; had acted as an expert witness for brokerage firms, including AMEX and that Donahue had worked with one of the lead lawyers for AEFA, AMERIPRISE and COHEN of the SEC in Los Angeles).

116.   B&F, Dykema & R&P also failed to disclose  the conflicts of interest between  the DYKEMA  firm on the one part and AEFA, AMEX, and, on the other part until after the NASD removed  Plaintiffs  claims against AEFA, AMERIPRISE and COHEN  to the Superior Court and only disclosed  said conflict on the eve of the Superior Court hearing to reopen  Plaintiff's Superior Court Case  causing additional delay in Plaintiff's right to speedy determination of his grievances. In May 2011, Plaintiff learned that defendants B&F, DAVIS, R&P, DYKEMA CHIA, BENNETT, FAIRSHTER, DONAHUE, PHAN,  knew at the time of the NASD ruling that  it was part of the scheme/plan to deceive Plaintiff that he had to reopen the former Superior Court Case otherwise Plaintiff would not have been barred by the Statute of Limitations.

117.   Defendants AEFA, AMERIPRISE, and COHEN knew or should have known that the statements made to PLAINITFFS" regarding control of PLAINITFF'S accounts were false and/or misleading and said defendants , and each of them, concealed such information from Plaintiffs.

118.   Defendants law firms knew or should have known that the failure on their parts to disclose the inter-relationships of the law firms and/or the conflicts of interests  were false and/or misleading and said defendants, and each of them, concealed such information  from Plaintiffs with intent to deceive  and mislead Plaintiffs.

119.   .The pattern of racketeering activity directly and proximately damaged Plaintiffs, who suffered financial loss as a result of the fraudulent activities of the Defendants, and each of them

120.   Such pattern of racketeering activity constituted mail fraud violations of 18 U.SC. § 1341, wire fraud violations 18 USC  § 1343.,  conspiracy to obstruct justice 18 USC § 1962(d), financial institution fraud 18 USC § 1344 tampering with a witness 18 USC § 1512, obstruction of justice 18 USC § 1503,  interference with commerce, robbery or extortion 18 USC  § 1952. and involved dissemination

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

through the mail and by telephone and facsimile, of false and fraudulent pretenses, representations and promises, in order to obtain money from Plaintiffs  for trade and/or transaction fees and legal fees incident to the essential parts of the aforesaid schemes and artifices to defraud.

121.   The false representations and promises  and the dissemination through the mail and by telephone included, but were not limited to: (a) the use of the mail to disseminate information promoting financial investment and investment products being offered by AEFA and AMERIPRISE; (B) the use of the telephone and  facsimile to disseminate information promoting financial investment products being offered by AEFA and AMERIPRISE; (c) the use of the mail, telephone and facsimile to obtain Plaintiffs authorization to make certain investments trades and agree to various fee arrangements; (d) the use of the mail, telephone and facsimile to arrange and carry out the administration of the investment trades and various fee arrangements made on behalf of Plaintiffs; (e) the use of mail, telephone and facsimile to obtain Plaintiffs signature on various documents that consented to and/or acknowledged the investments trades and agreed to various fee arrangements wit v various  Defendants; (f) the use of the mail, telephone and facsimile to issue notices, demand, billings and collection information for information for investments  with AEFA and AMERIPRISE; (g) the use of the mail, telephone,  and facsimile by AEFA. AMEX, AMERIPRISE, to deprive Plaintiff of monies rightfully  due to him pursuant to  2002 Settlement Agreement;(h) ;the use of the mail, telephone and facsimile by AEFA, Ameriprise DAVIS, B&F, DYKEMA, R&P, FAIRSHTER,  GLICKMAN, GLICKMAN & GLICKMAN, BENNETT, PHAN, CHIA, DONAHUE to thwart Plaintiffs from having a full hearing  on the merits of  his case against AEFA, AMERIPRISE, and COHEN before the NASD;  (i) the use of the mail, telephone , and facsimile by AEFA, AMEX, AMERIPRISE,,   to deprive Plaintiff of entering into a fair and reasonable 2002 Settlement Agreement. (j) the use of the mail, telephone and

facsimile AEFA, and AMERIPRISE to conceal documents relevant to Plaintiffs claims to the NASD proceeding and conspiring with, PHAN, DONAHUE, CHIA, FAIRSHTER, BENNETT , R&P, B&F, GLICKMAN, GLICKMAN & GLICKMAN, and the DYKEMA firm to destroy said documents; (k) the use of the mail, telephone, and facsimile by AEFA, AMERIPRISE, COHEN, B&F, DYKEMA, DAVIS, R&P, GLICKMAN & GLICKMAN, DONAHUE, FAIRHSTER, BENNETT, MAHAVIER and GL;ICKMAN to delay Plaintiffs' claims against AEFA, AMERIPRISE, COHEN, being heard by any competent court or forum prior to AEFA spinning off AMERIPRISE as a separate subsidiary ; and (l) the use of the mail, telephone, and facsimile to issue notices, demands, billings and collection information for legal billings and dissemination of false information from B&F, DYKEMA and R&P firm.   The specific acts of the various Defendants which are incident to the essential parts of the aforesaid schemes and artifices are set forth in Paragraphs 36 through 95 above.

122.    The predicate acts, set forth above, by Defendants, and each of them, against Plaintiffs occurred after the enactment of the Racketeer Influence Corrupt Organization Act, 18 USC §1961, et seq,.

123.    Each of the acts of Defendants , and each of them, as described herein was conducted for the purposes of furthering the Defendants' scheme to promote and to continue the false and fraudulent pretenses, statements and promises, and to thereby defraud Plaintiffs and to gain and profit at Plaintiffs' expense by interfering with Plaintiffs' right to obtain a full hearing on the merits of his allegations against, AEFA, AMERPRISE, and COHEN.

124.    Each of these said acts of the Defendants, and each of them, regarding the Plaintiffs had similar purpose, involved the same or similarly situated acts thus constituted a pattern of racketeering activity with the meaning of the Racketeer Influence Corrupt Organizations Act, 18 USC §1961 et seq.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

125.   As a direct and proximate cause of the activities of Defendants, and each of them, which were violative of the Racketeer Influence Corrupt Organizations Act.  Plaintiffs suffered substantial loss and damages of there properties.  The loss entitles Plaintiffs to recover treble damages against Defendants, and each of them, and costs of suit, including reasonable attorney's fees, pursuant to 18 USC § 1961

<u>Fifth Claim for Relief</u>

(Against all Defendants)

Due Process

(5th amendment & 14th Amendment)

126.   Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as set forth in full.

127.   Plaintiffs were denied due process by the Defendants, and each of them, as guaranteed in the Americans with Disabilities Act(ADA) as factually asserted in paragraph 126.

128.   Plaintiffs were denied due process and equal protection of the laws when GLICKMAN, R&P,  PHAN compelled Plaintiff to go In Pro Se in the Probate Case knowing that Plaintiff would not be able to represent the Estate nor do discovery as to be in violation of the law.

129.   Plaintiffs due process rights were violated when Defendants DYKEMA, B&F,  R&P,GLICKMAN, PHAN, DONAHUE, CHIA, FAIRSHTER, BENNETT, AEFA and AMEX did not re-file Plaintiffs claim against AEFA and COHEN in either State Superior Court or Federal Court pursuant to NASD Code § 10305.

130.   Plaintiffs were denied due process by the Defendants, and each of them, in the original 2002 Settlement Agreement as a Probate Court Order for reasons detailed in paragraph 126.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

131.   Plaintiffs were denied due process by the Defendants, and each of them, as guaranteed in the equal protection clause of the 14th amendment of the US. Constitution.

132.   Plaintiffs were denied due process by the Defendants, and each of them, when Plaintiff did not have a full trial in the Superior Court in 2002 as detailed in paragraph 126.

133.   Plaintiffs were denied due process by the Defendants, and each of them, when Plaintiffs did not get a hearing on the merits of the case in the NASD as detailed in paragraph 126.

134.   Plaintiffs were denied due process by the Defendants, and each of them, in the Superior court hearings in 2006 as detailed in paragraph 126.

135.   Plaintiffs were denied due process by the Defendants, and each of them, when the appeal was filed in 2007 after the Superior Court case number LC.

136.   Plaintiffs were denied due process by the Defendants, and each of them, in the Federal Court case #CV-09-3179GHK.

137.   Plaintiffs were denied due process by the Defendants, and each of them, when Plaintiffs were denied access to the use of members of the bar, paralegals, attorneys services, and court reporters services i.e. LA Reporters.

138.   Plaintiffs were denied due process by Defendant STATEBAR when Plaintiff filed attorney complaint against Matthew FAIRSTHER and Joel BENNETT and it was inappropriately handed by principal investigator Michael O Chavez to such an extent that FBI special agent knew that the complaint would result in a letter stating that Chavez found that FAIRSHTER and BENNETT had committed no violations of ethics or criminal conduct.

139.   Plaintiffs were denied due process by the Defendants, and each of them, in the Ameriprise State Case BC435030, where Plaintiffs did not get a fair hearing and were demurred out.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

140.   Plaintiffs were denied due process by the Defendants, and each of them, in the legal malpractice case BC394851 in that Plaintiff was advised that the case was for seeking damages for both the Plaintiffs personal account at AEFA and the Baker Family accounts at AEFA and on May 30, 2012, Plaintiff learned that the case was solely about Plaintiffs personal account.

141.   Plaintiffs were denied due process by the Defendants, and each of them, in the legal malpractice case BC408161 since Plaintiff never received a trial on the merits due to the unethical and false statements by STERN when he withdraw as counsel.

142.   Plaintiffs were denied due process by the Defendants, and each of them, when they committed violations of Obstruction of Justice Act as detailed in that cause of action.

143.   Plaintiffs were denied due process by the Defendants, and each of them, when they committed violations of the Conspiracy to commit Obstruction of Just as detailed in that cause of action.

144.   Plaintiff is denied due process by the Defendants, and each of them, in compelling  this  Plaintiff to pay the filing fee of $350 to file this complaint  in the hope of obtaining due process of the 14th amendment of the US. Constitution.

145.   Plaintiff is denied is due process rights by the Defendants, and each of them, in compelling the Plaintiff to spend countless hours in preparing this complaint in the hope of obtaining due process of the 14th amendment of the US. Constitution.

<u>Sixth Claim for Relief</u>

(Against all Defendants)

(Elder Abuse and Dependent Adult Protection Act)

(California Welfare & Institutions Code § 15600 et seq.)

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE